# Exhibit 3



# Cook County
# Clerk of the Circuit Court
### Electronic Docket Search
Chancery, Domestic/Child Support, Civil and Law Divisions

Case Information Summary for Case Number
2015-CH-05427

Filing Date: 4/1/2015                          Case Type: CLASS ACTION
Division: Chancery Division                     District: First Municipal
Ad Damnum: $0.00                                Calendar: 07

## Party Information

| Plaintiff(s) | Attorney(s) |
|---|---|
| LICATA CARLO | KAMBER EDELSON LLC |
| | 350 N LASALLE 1300 |
| | CHICAGO IL, 60654 |
| | (312) 589-6370 |

| Date of Service | Defendant(s) | Attorney(s) |
|---|---|---|
| | DELAWARE CORPORATION | |
| | FACEBOOK INC | |

## Case Activity

Activity Date: 4/1/2015                         Participant: LICATA CARLO

CLASS ACTION COMPLAINT FILED

Court Fee: 337.00                               Attorney: KAMBER EDELSON LLC

Activity Date: 4/1/2015                         Participant: LICATA CARLO

EXHIBITS FILED

Attorney: KAMBER EDELSON LLC

Activity Date: 4/1/2015                         Participant: LICATA CARLO

SUMMONS ISSUED AND RETURNABLE

Attorney: KAMBER EDELSON LLC

Activity Date: 4/1/2015                                Participant: LICATA CARLO

MOTION FILED

Attorney: KAMBER EDELSON LLC

Activity Date: 4/2/2015                                Participant: LICATA CARLO

CASE SET ON CASE MANAGEMENT CALL

Date: 7/31/2015                    Judge: LARSEN, DIANE J.
Court Time: 1000                   Attorney: KAMBER EDELSON LLC
Court Room: 2405

---

Please note: Neither the Circuit Court of Cook County nor the Clerk of the
Circuit Court of Cook County warrants the accuracy, completeness, or the currency
of this data. This data is not an official record of the Court or the Clerk and may
not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data
in our master database.

Start a New Search

Chancery Division Civil Cover Sheet - General Chancery Section      (Rev. 11/06/13) CCCH 0623

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

CARLO LICATA, individually and on behalf of all others similarly situated,

                                      **Plaintiff**

v.

FACEBOOK, INC.

                                     **Defendant**

No. 
```
2015CH05427
CALENDAR/ROOM 07
TIME 00:00
Class Action
```

### CHANCERY DIVISION CIVIL COVER SHEET
### GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

| | | |
|---|---|---|
| 0005 | ☐ | Administrative Review |
| 0001 | ☑ | Class Action |
| 0002 | ☐ | Declaratory Judgment |
| 0004 | ☐ | Injunction |

| | | | | | | |
|---|---|---|---|---|---|---|
| 0007 | ☐ | General Chancery | 0019 | ☐ | Partition |
| 0010 | ☐ | Accounting | 0020 | ☐ | Quiet Title |
| 0011 | ☐ | Arbitration | 0021 | ☐ | Quo Warranto |
| 0012 | ☐ | Certiorari | 0022 | ☐ | Redemption Rights |
| 0013 | ☐ | Dissolution of Corporation | 0023 | ☐ | Reformation of a Contract |
| 0014 | ☐ | Dissolution of Partnership | 0024 | ☐ | Rescission of a Contract |
| 0015 | ☐ | Equitable Lien | 0025 | ☐ | Specific Performance |
| 0016 | ☐ | Interpleader | 0026 | ☐ | Trust Construction |
| 0017 | ☐ | Mandamus | | ☐ | Other (specify) _____ |
| 0018 | ☐ | Ne Exeat | | | |

RECEIVED 2015 APR -1 AM 11: 51 DOROTHY BROWN CLERK OF THE CIRCUIT COURT DOMESTIC RELATIONS

By: Edelson PC

☑ Atty. No.: 44146      ☐ Pro Se 99500

Name: Edelson PC

Atty. for: Plaintiff Carlo Licata

Address: 350 North LaSalle Street, Suite 1300

City/State/Zip Code: Chicago, Illinois 60654

Telephone: 312.589.6370

Service via email from the opposing party/counsel will be accepted at:

by consent pursuant to Ill. Sup. Court Rules 11 and 131.

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | (2/28/11) CCG N001 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY _____ DIVISION

2015CH05427
CALENDAR/ROOM 07
TIME 00:00
No. ~~Class Action~~

CARLO LICATA, individually and on behalf of all others similarly situated,

_____
(Name all parties)

v.

FACEBOOK, INC. _____

Facebook, Inc.

c/o Corporation Service Company

2711 Centerville Rd., Ste. 400, Wilmington DE 19808

## ◉ SUMMONS ◯ ALIAS SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

◉ Richard J. Daley Center, 50 W. Washington, Room 1001 _____, Chicago, Illinois 60602

| | | |
|---|---|---|
| ◯ District 2 - Skokie<br>5600 Old Orchard Rd.<br>Skokie, IL 60077 | ◯ District 3 - Rolling Meadows<br>2121 Euclid<br>Rolling Meadows, IL 60008 | ◯ District 4 - Maywood<br>1500 Maybrook Ave.<br>Maywood, IL 60153 |
| ◯ District 5 - Bridgeview<br>10220 S. 76th Ave.<br>Bridgeview, IL 60455 | ◯ District 6 - Markham<br>16501 S. Kedzie Pkwy.<br>Markham, IL 60428 | ◯ Child Support<br>28 North Clark St., Room 200<br>Chicago, Illinois 60602 |

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 44146 _____

Name: Edelson PC

Atty. for: Plaintiff Carlo Licata

Address: 350 North LaSalle Street, Suite 1300

City/State/Zip: Chicago, Illinois 60654

Telephone: 312.589.6370

WITNESS, DOROTHY BROWN APR 0 1 2015

_____
Clerk of Court

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code) (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

CARLO LICATA, individually and on behalf of all others similarly situated,

        *Plaintiff,*

v.

FACEBOOK, INC., a Delaware corporation,

        *Defendant.*

Case No.

2015CH05427
CALENDAR/ROOM 07
TIME 00:00
Class Action

RECEIVED
15 APR -1 AM 11:52
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
DOMESTIC RELATIONS

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Carlo Licata brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Facebook, Inc. to put a stop to its surreptitious collection, use, and storage of Plaintiff's and the proposed Class's sensitive biometric data. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE ACTION

1.     Facebook operates the largest online social network in the world, with over one billion active users.

2.     Users of Facebook's platform can, among other things, upload and share photographs with friends and relatives. Once uploaded, users can organize and share their digital photographs by "tagging" (*i.e.,* identifying by name) Facebook friends who appear in the pictures.

3.     In a purported attempt to make the process of tagging friends easier, Facebook launched a program in 2010 called "Tag Suggestions." In its simplest form, Tag Suggestions functions by scanning photographs uploaded by the user and then identifying Facebook friends

who appear in the photos. If Tag Suggestions recognizes and identifies one of the user's Facebook friends, Facebook will suggest that individual's name and/or automatically tag them.

4.     Unfortunately, Facebook actively conceals from its users that its Tag Suggestion feature actually uses proprietary facial recognition software to scan their uploaded photographs, locate their faces, extract unique biometric identifiers associated with their faces, and determine who they are. For instance, Facebook doesn't disclose its wholesale biometrics data collection practices in its privacy policies, nor does it even ask users to acknowledge them. Instead, Facebook merely hints at the underlying functionality behind Tag Suggestions—only describing the feature's use of facial recognition software on remote sections of its website. With millions of its users in the dark about the true nature of this technology, Facebook secretly amassed the world's largest privately held database of consumer biometrics data.

5.     In addition to demonstrating a brazen disregard for its users' privacy rights, Facebook's actions also violate the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), which was specifically designed to protect Illinois consumers from practices like Facebook's. Specifically, Facebook's actions violated (and continue to violate) the BIPA because it did not:

- Properly inform Plaintiff or the Class in writing that their biometric data was being collected or stored, as required by the BIPA;

- Properly inform Plaintiff or the Class in writing of the specific purpose and length of time for which their biometric data was being collected, stored, and used, as required by the BIPA;

- Provide a publicly available retention schedule and guidelines for permanently destroying the biometric data of Plaintiff and the Class (who don't opt-out of "Tag Suggestions") as required by the BIPA; and most importantly,

- Receive a written release from Plaintiff or the members of the Class to collect, store, or use their biometric data as required by the BIPA.

6.     Accordingly, this Complaint seeks an order (i) declaring that Facebook's conduct

2

violates the BIPA, (ii) requiring Facebook to cease the unlawful activities discussed herein, and (iii) awarding statutory damages to Plaintiff and the proposed Class.

## PARTIES

7. Plaintiff Carlo Licata is a natural person and resident of Cook County and the State of Illinois.

8. Defendant Facebook, Inc. is a corporation existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 1601 Willow Road, Menlo Park, California 94025. Facebook is also registered to conduct business in the State of Illinois (as entity number 66267067). Facebook conducts business throughout this County, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 because Defendant conducts business transactions in Illinois, has committed tortious acts in Illinois, is registered to conduct business in Illinois, and has offices located in Illinois. Additionally, this Court has personal jurisdiction over Plaintiff Licata because he is a resident of the State of Illinois.

10. Venue is proper in Cook County because Defendant is registered to conduct business in Illinois, conducts business transactions in Cook County, entered into a contract with Plaintiff Licata in Cook County, and the causes of action arose, in substantial part, in Cook County. Venue is additionally proper because Plaintiff Licata resides in Cook County and Facebook has offices located in Cook County.

## FACTUAL BACKGROUND

### I.     The Use of Biometrics and Consumer Privacy.

11.     "Biometrics" refers to technologies used to identify an individual based on unique physical characteristics. One of the most prevalent uses of biometrics is facial recognition technology, which works by scanning an image for human faces (or scanning an actual person's face), extracting facial feature data, and comparing them against information stored in a "faceprint database." If a database match is found between the extracted facial data and the "biometric identifiers" (*i.e.*, details about the face's geometry), a person may be identified.

12.     The recent development of sophisticated facial recognition software has generated unique opportunities for commercial application of the technology, while also raising serious concerns about its threat to consumer privacy. During a 2012 hearing of the United States Senate Subcommittee on Privacy, Technology, and the Law, one expert testified that facial recognition technology takes the "risks inherent in . . . biometrics to a new level because Americans cannot take precautions to prevent the collection of their image," and that "[f]ace recognition allows for covert, remote and mass capture and identification."[1]

13.     In discussing the dangers associated with obtaining and storing a person's facial biometric identifiers, the expert further noted that someone with access to an individual's faceprint can use it to find their "name, . . . social networking account and . . . can [be used to] find and track [them] in the street, in the stores [they] visit, the government buildings [they]

---

[1]     *What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012) (statement of Jennifer Lynch, Staff Attorney, Electronic Frontier Foundation), *available at* https://www.eff.org/files/filenode/jenniferlynch_eff-senate-testimony-face_recognition.pdf.

enter, and the photos [their] friends post online."[2]

14.    During the hearing, captioned "What Facial Recognition Technology Means for Privacy and Civil Liberties," Senator Al Franken asserted that "there is nothing inherently right or wrong with [facial recognition technology, but] if we do not stop and carefully consider the way we use [it], it may also be abused in ways that could threaten basic aspects of our privacy and civil liberties."[3] For example, Sen. Franken continued, it is possible to use the technology to identify people at a distance and in crowds and could be "abused to not only identify protesters at political events and rallies, but to target them for selective jailing and prosecution."[4]

15.    Federal regulators have voiced similar concerns. In late 2011, the Federal Trade Commission ("FTC") hosted a series of wide-ranging discussions with researchers, academics, and industry representatives (including Facebook) about facial recognition technologies. Among the topics examined were the potential hazards of a third party maliciously breaching a database of biometric information. The consequences of such a breach would be especially harmful because unlike numerical identifiers (*e.g.*, Social Security numbers), which can be replaced or re-assigned, biometrics are biologically unique to each person and therefore, once exposed, a victim has no recourse to prevent becoming victim to misconduct like identity theft and unauthorized tracking.

16.    From these discussions, the FTC formulated a "Best Practices" guide for

---

[2]    *What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012) (statement of Sen. Al Franken, Chairman, Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary), *available at* http://www.franken.senate.gov/?p=press_release&id=2144.

[3]    *Id.*

[4]    *Id.*

companies using facial recognition technology.[5] One consistent theme throughout the FTC's guide is the necessity that companies provide consumers with the option to affirmatively consent to the collection of their biometric identifiers *before* ever scanning and extracting biometric data from digital photographs.

17.     Concentrating on social networks in particular, the FTC noted that "[b]ecause this [facial recognition technology] use is not currently within the context of consumers' relationship with the social network, when the company first rolls out this feature and begins analyzing users' photos to gather biometric data, it should provide users with a clear notice, outside of a privacy policy, about how the feature works, what data it collects, and how that data will be used. Companies should also provide consumers with an easy to find, meaningful choice not to have their biometric data collected and used for facial recognition."[6]

18.     As explained below, obtaining the consent of users and following the FTC's guidelines is precisely what Facebook *did not do* when it rolled out its facial recognition program. Not only do Facebook's actions controvert industry best practices, they also violate the privacy rights of Illinois residents.

## II.     Illinois's Biometric Information Privacy Act.

19.     In 2008, Illinois enacted the BIPA in recognition of the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information." Illinois House Transcript, 2008 Reg. Sess. No. 276. As such, the BIPA makes it unlawful for a company to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a

---

[5]     *See Facing Facts: Best Practices for Common Uses of Facial Recognition Technologies*, Federal Trade Commission (Oct. 2012), *available at* http://www.ftc.gov/sites/default/files/documents/reports/facing-facts-best-practices-common-uses-facial-recognition-technologies/121022facialtechrpt.pdf.

[6]     *Id.*

person's or a customer's biometric identifiers[7] or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;

> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

> (3) receives a written release executed by the subject of the biometric identifier or biometric information."

740 ILCS 14/15(b).

20. The BIPA also establishes standards for how companies must handle Illinois consumers' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS 14/15(c) – (d). For instance, the BIPA prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information, 740 ILCS 14/15(c), and requires that companies develop a written policy—made available to the public—establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/15(a).

**III.    Facebook Violates the Biometric Information Privacy Act.**

21. In 2010, Facebook launched a program dubbed "Tag Suggestions" that claimed to "automate the process of identifying and, if the user chooses, tagging friends in the photos he or she uploads."[8]

---

[7]     The BIPA's definition of "biometric identifier" expressly includes information collected about the geometry of the face (*i.e.*, facial data obtained through facial recognition technology). *See* 740 ILCS 14/10.

[8]     *What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary,* 112th Cong. 1 (2012) (statement of Robert Sherman, Manager of Privacy and Public Policy, Facebook,

22.     Unbeknownst to the average consumer, Tag Suggestions relies on proprietary facial recognition technology to scan photographs, locate a person's face, and determine who he or she is. Figure 1 below depicts an example of how Tag Suggestions would appear to a user on Facebook's website.



(**Fig. 1.**)

23.     The technology works by calculating similarities in previously uploaded photographs of a person and creating a unique standalone faceprint of the individual, which Facebook refers to as a "template."

24.     "Template" data stored by Facebook is derived in part from biometric identifiers collected from the image of a person's face. According to Facebook's website, these biometric identifiers include information about the geometry of a person's face, including the distance between the eyes, nose, and ears. (*See* Figure 2 on the following page, showing an example of the geometric data points of a human face.)

Inc.), *available at* http://www.judiciary.senate.gov/imo/media/doc/12-7-18ShermanTestimony.pdf.



**(Fig. 2.)**

25.     Without even informing its users—*let alone obtaining their informed written consent*—when Facebook activated Tag Suggestions, it automatically enrolled its users into its facial recognition program and began creating templates from their uploaded photographs and previously tagged pictures. Because they were only allowed to opt out of the program *after the fact*, Facebook users unwittingly had their photographs scanned and processed to collect their biometric identifiers—a practice that continues to this day.

26.     Criticism of Facebook's program followed shortly after its initial implementation. Data protection officials in Europe alleged that Facebook was illegally compiling a database of biometric data without user consent. After an investigation by the European Union, Facebook agreed to discontinue its facial recognition program in Europe in 2012.

27.     In the United States, Congressional inquiries were held. Speaking about Facebook's Tag Suggestions program, Sen. Franken asserted that, "Facebook may have created the world's largest privately-held database of faceprints—without the explicit consent of its users."[9] And in fact, Sen. Franken was right.

---

[9]     *See What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing*

A. **Facebook never requires users to acknowledge its biometric data collection practices, never obtains their express written consent to collect the same, and, instead, hides the fact that it systematically collects users' biometrics.**

28.     Since Tag Suggestions debuted in 2010, Facebook has been calculatedly elusive in explaining how the technology works or how it would be used to collect millions of users' biometric data (*i.e.*, their faceprints).

29.     In fact, since the Tag Suggestions feature was rolled out, Facebook has kept its biometrics data collection practices out of its privacy policies and has instead placed ambiguous statements about the true nature of its Tag Suggestions program on remote sections of its website (such as in its "Help Center" or the now defunct "Notes" sections). Uncovering these remote sections requires a user to not only know about Tag Suggestions in the first place, but also affirmatively seek out more information through multiple layers of additional pages.

30.     Worse still, Facebook doesn't even require users to acknowledge its collection of their biometric data, let alone receive a written release from users before collecting their faceprints.

31.     Instead, Facebook markets its Tag Suggestions technology as a convenience feature that allows users to automate the process of identifying and tagging friends in the photos they upload. For instance, in or around June 2011 (*after* Facebook had already collected millions of users' faceprints without explicit permission), advertisements for Tag Suggestions started to appear alongside commercial ads, alerts, event listings, and other updates with the innocuous heading "Photos are better with Friends"—which served to decrease the likelihood that consumers would notice or believe the item to be an important or relevant point of information.

---

*Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012) (statement of Sen. Al Franken, Chairman, Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary), *supra* note 2.

(*See* Figure 3 below showing a screenshot of a "Photos are better with Friends" advertisement.)



(**Fig. 3.**)

The text, highlighted in red in Figure 3, falls considerably short of the FTC's guidance that companies should "provide users with a clear notice, outside of a privacy policy, about how the [facial recognition] feature works, what data it collects, and how that data will be used."[10]

32.    Even more problematic, Facebook's website does not have a written, publicly-available policy identifying its retention schedule, nor guidelines for permanently destroying users' (who don't opt-out of "Tag Suggestions") biometric identifiers when the initial purpose for collecting or obtaining such identifiers (or information has been satisfied or within three years of the individual's last interaction with Facebook) as required by the BIPA.

33.    By and through the actions detailed above, Facebook not only disregarded its users' privacy rights, but it also violated their statutorily protected rights to control the collection, use, and storage of their sensitive biometric data.

**IV.    Plaintiff Licata's Experience.**

34.    Licata has been a member of Facebook's social network since 2009. Since then, Licata has uploaded photographs to his account—including those used for his profile pictures—

---

[10]    *See* note 5, *supra.*

and has frequently been tagged in photos by friends.

35.     Licata never consented, agreed, or gave permission—written or otherwise—to Facebook to collect or store biometrics identifiers associated with his faceprint. Further, Licata was never provided with nor ever signed a written release allowing Facebook to collect or store his biometric identifiers derived from his faceprint.

36.     Worse still, Facebook never even informed Licata by written notice or otherwise that he could prevent Facebook from collecting or storing biometric identifiers derived from his faceprint.

37.     Likewise, Licata was never provided with an opportunity to prohibit or prevent Facebook from collecting or storing biometric identifiers derived from his faceprint.

38.     Nevertheless, when Licata uploaded photographs to his account and made them his profile pictures and also when he was tagged in photos, Facebook scanned those photos, located his face, determined who he was, and created a unique faceprint or "template" for him based on his biometric identifiers, including his facial geometry. Facebook subsequently stored Licata's faceprint in its databases.

## CLASS ALLEGATIONS

39.     **Class Definition**: Plaintiff Licata brings this action pursuant to 735 ILCS 5/2-801 on behalf of himself and a class of similarly situated individuals, defined as follows:

> All residents of the State of Illinois who had their faceprints collected, captured, received, or otherwise obtained by Facebook while residing in Illinois.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly

execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

40.      **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. Defendant has collected, captured, received, or otherwise obtained biometric identifiers or biometric information from thousands of consumers who fall into the definition of the Class. Ultimately, the Class members will be easily identified through Defendant's records.

41.      **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a)     whether Facebook collected or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

b)     whether Facebook properly informed Plaintiff and the Class that it collected, used, and stored their biometric identifiers or biometric information;

c)     whether Facebook obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometrics identifiers or biometric information;

d)     whether Facebook has sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometrics identifiers or biometric information;

e)     whether Facebook developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometrics information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of their last interaction, whichever occurs first;

13

f) whether Facebook used Plaintiff's and the Class's biometric identifiers or biometric information to identify them; and

g) whether Facebook's violations of the BIPA were committed intentionally, recklessly, or negligently.

42. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

43. **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

14

**FIRST CAUSE OF ACTION**
**Violation of 740 ILCS 14/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

44.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

45.     The BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; *and* (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ." 740 ILCS 14/15(b) (emphasis added).

46.     Facebook is a Delaware corporation and thus qualifies as a "private entity" under the BIPA. *See* 740 ILCS 14/10.

47.     Plaintiff and the Class are individuals who had their "biometric identifiers" collected by Facebook's facial recognition software (in the form of their facial geometries extracted from uploaded digital photographs), as explained in detail in Section III. *See* 740 ILCS 14/10.

48.     Plaintiff's and the Class's biometric identifiers were used to identify them, and therefore constitute "biometric information" as defined by the BIPA. *See* 740 ILCS 14/10.

49.     Facebook systematically and automatically collected, used, and stored their biometric identifiers or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

50.     In fact, as explained in Section III.A, Facebook didn't properly inform Plaintiff or the Class in writing that their biometric identifiers or biometric information were being collected

15

and stored, nor did it inform them in writing of the specific purpose and length of term for which their biometric identifiers or biometric information was being collected, stored, and used as required by 740 ILCS 14/15(b)(1) – (2).

51.     In addition, Facebook does not publicly provide a retention schedule or guidelines for permanently destroying its users' (who don't opt-out of "Tag Suggestions") biometric identifiers and biometric information as specified by the BIPA. *See* 740 ILCS 14/15(a).

52.     By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Facebook violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in the BIPA, 740 ILCS 14/1, *et seq.*

53.     On behalf of himself and the Class, Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Facebook to comply with the BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (2) statutory damages of $5,000 for the intentional and reckless violation of the BIPA pursuant to 740 ILCS 14/20(2), or alternatively, statutory damages of $1,000 pursuant to 740 ILCS 14/20(1) if the Court finds that Facebook's violations were negligent; and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carlo Licata, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Licata as representative of the Class, and appointing his counsel as Class

Counsel;

      B.    Declaring that Facebook's actions, as set out above, violates the BIPA, 740 ILCS

14/1, *et seq.*;

      C.    Awarding statutory damages of $5,000 for the intentional and reckless violation

of the BIPA pursuant to 740 ILCS 14/20(2), or alternatively, statutory damages of $1,000

pursuant to 740 ILCS 14/20(1) if the Court finds that Facebook's violations were negligent;

      D.    Awarding injunctive and other equitable relief as is necessary to protect the

interests of the Class, including, *inter alia*, an order requiring Facebook to collect, store, and use

biometric identifiers or biometric information in compliance with the BIPA;

      E.    Awarding Plaintiff and the Class their reasonable litigation expenses and

attorneys' fees;

      F.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable; and

      G.    Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

                      Respectfully submitted,

                      **CARLO LICATA**, individually and on behalf of
all others similarly situated,

Dated: April 1, 2015          By: _____

                          One of Plaintiff's Attorneys

                      Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com

J. Dominick Larry
nlarry@edelson.com
David I. Mindell
dmindell@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

CARLO LICATA, individually and on behalf of all others similarly situated,

        *Plaintiff,*

   v.

FACEBOOK, INC., a Delaware corporation,

        *Defendant.*

Case No.

2015CH05427
CALENDAR/ROOM 07
TIME 00:00
Class Action

RECEIVED
15 APR -1 AM 11:5
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
DOMESTIC RELATIONS

## PLAINTIFF'S MOTION FOR AND MEMORANDUM
## IN SUPPORT OF CLASS CERTIFICATION

Plaintiff Carlo Licata, by and through his undersigned counsel, hereby respectfully moves

the Court for an Order certifying this case as a class action pursuant to Section 2-801 of the

Illinois Code of Civil Procedure, but requests that the Court enter and continue the instant motion

until after the completion of discovery on class-wide issues, at which time Plaintiff will submit a

more detailed memorandum of points and authorities in support of class certification.[1]

## I.    INTRODUCTION.

Defendant Facebook—the largest online social network in the world—surreptitiously

collects, stores, and uses the sensitive biometric data of *millions* of its users without, among other

things, their knowledge, authorization, or consent. In addition to demonstrating a brazen

---

[1]    Plaintiff files this motion at the outset of the litigation to prevent Defendant Facebook, Inc. from attempting a so-called "buy off" to moot his representative claims (*i.e.*, tendering to him the full amount of his individual damages alleged in his Class Action Complaint and Demand for Jury Trial ("Complaint")). *See Damasco v. Clearwire Corp.*, 662 F.3d 891, 896 (7th Cir. 2011) ("Class-action plaintiffs can move to certify the class at the same time that they file their complaint. The pendency of that motion protects a putative class from attempts to buy off the named plaintiffs . . . . If the parties have yet to fully develop the facts needed for certification, then they can also ask the district court to delay its ruling to provide time for additional discovery or investigation.").

1

disregard for its users' privacy rights, Facebook's actions also violate the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), which was specifically designed to protect Illinois consumers from practices like those alleged in this case. Specifically, and as described more fully in the Complaint, the BIPA requires, *inter alia*, that companies (like Facebook): (i) inform consumers (like Plaintiff and the proposed Class) in writing when their biometric data is collected or stored; (ii) inform them of the specific purpose and length of term for which their biometric data is collected, stored, and used; (iii) make available a retention schedule and guidelines for permanently destroying such biometric data; (iv) and, most importantly, receive a written release before collecting, storing, or using their biometric data.

Even at this early stage of litigation, this is a textbook example of a case suitable for class certification. For all relevant purposes, the factual and legal issues are identical. Facebook did not: (i) properly inform Plaintiff or the proposed Class in writing that their biometric data was being collected or stored; (ii) properly inform them in writing of the specific purpose and length of time for which their biometric data was being collected, stored, and used; (iii) make a publicly available retention schedule or guidelines for permanently destroying biometric data; and most importantly, (iv) *receive a written release from Plaintiff or the Class to collect, store, or use their biometric data*, as required by the BIPA. The injuries suffered by Plaintiff and the putative Class as a result of Facebook's conduct are identical. That is, each member of the putative Class has had, among other things, their sensitive biometric data collected, stored, and used, without ever signing or even being presented with a written release as required by the BIPA and, as such, have had their statutorily protected rights violated in the same exact manner.

For these reasons, and as discussed further herein, the proposed Class meets each prerequisite to certification under Section 2-801, and the Court should grant the instant motion in

2

its entirety.

## II.    FACTUAL BACKGROUND.

### A.    Facts Applicable to All Members of the Putative Class.

Facebook operates the largest online social network in the world, with over one billion active users. (*See* Plaintiff's Class Action Complaint and Demand for Jury Trial ("Compl.") ¶ 1.) Users of Facebook's platform can, among other things, upload and share photographs with friends and relatives. (*Id.* ¶ 2.) Once uploaded, users can organize and share their digital photographs by "tagging" (*i.e.,* identifying by name) Facebook friends who appear in the pictures. (*Id.*)

In a purported attempt to make the process of tagging friends easier, Facebook launched a program in 2010 called "Tag Suggestions." (*Id.* ¶ 3.) In its simplest form, Tag Suggestions functions by scanning photographs uploaded by the user and then identifying Facebook friends who appear in the photos. (*Id.*) If a Facebook friend is identified, Facebook will suggest that individual's name and/or automatically tag them. (*Id.*)

Unfortunately, Facebook actively conceals from its users that its Tag Suggestion feature actually uses proprietary facial recognition software to scan their uploaded photographs, locate their faces, extract unique biometric identifiers associated with their faces, and determine their identities. (*Id.* ¶ 4.) For instance, Facebook doesn't disclose its wholesale biometrics data collection practices in its privacy policies nor does it even ask users to acknowledge the same— let alone obtain a written release from them, as required by the BIPA. (*Id.* ¶¶ 4–5.)

### B.    Facts Applicable to Plaintiff Licata.

Plaintiff is just one of potentially millions of Illinois consumers who had their sensitive biometric data (*i.e.,* their faceprints) collected by Facebook without their knowledge,

authorization, or informed written consent. (Compl. ¶ 38.) Licata has been a member of

Facebook's social network since 2009, has uploaded photographs to his account—including

those used for his profile pictures—and has frequently been tagged in photos by friends. (*Id.*

¶ 34.) However, Licata has never consented, agreed, or given permission in any form to

Facebook to collect or store biometrics identifiers associated with his faceprint. (*Id.* ¶ 35.)

Further, Facebook never informed Licata in writing or otherwise that he could prevent Facebook

from collecting or storing biometric identifiers derived from his faceprint. (*Id.* ¶ 36.)

Nevertheless, when Licata uploaded photographs to his account and made them his

profile pictures—and also when he was tagged in photos—Facebook scanned those photos,

located his face, determined who he was, and created a unique faceprint or "template" for him

(based on his biometric identifiers, including his facial geometry). (*Id.* ¶ 38.) Facebook

subsequently stored Licata's faceprint in its databases. (*Id.*)

### C.    The Claims Alleged in this Lawsuit.

In his Complaint, Plaintiff alleges one cause of action against Facebook: violations of the

Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.*

### D.    The Proposed Class.

As a result of Facebook's conduct described above, Plaintiff brings the instant lawsuit

and now seeks certification of a class of individuals (the "Class"), defined as follows:

> All residents of the State of Illinois who had their faceprints collected, captured, received,
> or otherwise obtained by Facebook while residing in Illinois.

(Compl. ¶ 39.) As demonstrated below, the proposed Class meet each of the requisites to

certification under Section 2-801 and therefore, the instant motion should be granted in its

entirety.

4

### III. THE PROPOSED CLASS SATISFIES EACH OF THE REQUIREMENTS FOR CERTIFICATION.

To obtain class certification, it is not necessary for a plaintiff to establish that he or she will prevail on the merits of the action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (internal quotation marks and citation omitted).[2] As such, in determining whether to certify a proposed class, courts generally accept the allegations of a complaint as true. *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 51–53 (Ill. App. Ct. 2007). Illinois circuit courts have broad discretion in determining whether a proposed class meets the requirements for class certification and ought to err in favor of granting certification. *Id.* at 53. "Although courts in some cases have found that some discovery could be helpful prior to addressing [a motion for class certification], such delay is by no means necessary." *Parker v. Risk Mgt. Alt., Inc.*, 206 F.R.D. 211, 214 (N.D. Ill. 2002).

To proceed with a class action here, Plaintiff must demonstrate that the "prerequisites for the maintenance of a class action" as set forth in Section 2-801 have been satisfied: "(1) [t]he class is so numerous that joinder of all members is impracticable[;] (2) [t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members[;] (3) [t]he representative parties will fairly and adequately protect the interest of the class[; and] (4) [t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801; *see also Lee v. Allstate Life*

---

[2]     Section 2-801 is modeled after Rule 23 of the Federal Rules of Civil Procedure and therefore, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 125 (2005).

*Ins. Co.*, 361 Ill. App. 3d 970, 974 (Ill. App. Ct. 2005). As demonstrated below, the proposed

Class meets each of Section 2-801's prerequisites and should be certified.

**A.      Numerosity: The Proposed Class is Sufficiently Numerous and Consists of Thousands of Individual Members.**

The first step in certifying a class is a showing that "the class is so numerous that joinder

of all members is impracticable." 735 ILCS 5/2-801(1). This requirement is met when joining

"such a large number of plaintiffs in a single suit would render the suit unmanageable and, in

contrast, multiple separate claims would be an imposition on the litigants and the courts."

*Gordon v. Boden*, 224 Ill. App. 3d 195, 200 (Ill. App. Ct. 1991) (*citing Steinberg v. Chicago*

*Med. Sch.*, 69 Ill. 2d 320, 337 (1977)). "Plaintiffs need not demonstrate a precise figure for the

class size, because a good-faith, nonspeculative estimate will suffice." *Cruz v. Unilock Chicago*,

383 Ill. App. 3d 752, 771 (Ill. App. Ct. 2008). Generally, "[t]he court is permitted to make

common sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs.*,

*LLC*, 2004 WL 719278, at *2 (N.D. Ill. March 31, 2004) (citations omitted); *see also* 3 ALBA

CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 7.20, 66 (4th ed. 2001).

In this case, the Court need not exercise its assumptive abilities as Facebook, through its

own assertions, states that there are more than 1,000 people tagged in photos in Illinois; meaning,

that Facebook scanned thousands of users' photographs, located their faces, and extracted unique

biometric identifiers associated with their faces without their knowledge, authorization, or

informed consent written all in violation of the BIPA. *See Facebook Search Results for "People*

*Tagged In Photos Taken In Illinois"*, Facebook, Inc.,

https://www.facebook.com/search/112386318775352/photos-in/users-tagged (last visited April

1, 2015); *see also Heastie v. Comm. Bank of Greater Peoria*, 125 F.R.D. 669, 673 (N.D. Ill.

1989) (classes numbering in the thousands "clearly" satisfy the numerosity requirement); *Kulins*

*v. Maleo, A Microdot Co., Inc.*, 121 Ill. App. 3d 520, 530 (Ill. Ct. App. 1984) (finding that in Cook County, 30 class members was sufficient to satisfy numerosity to lessen the backlog of cases before the court).

Likewise, Plaintiff alleges—and discovery will show—that Facebook has collected, captured, received, or otherwise obtained biometric identifiers or biometric information from thousands of consumers who fall into the definition of the proposed Class. (Compl. ¶ 40); *see Carrao v. Health Care Serv. Corp.*, 118 Ill. App. 3d 417, 427 (Ill. App. Ct. 1983) ("The allegation in the complaint that the class consists of over 1,000 members provides an ample basis for the trial court's conclusion that joinder of all members is impracticable."). Joinder of the Class's claims would also be impracticable because their claims are small relative to the resources necessary to prosecute this litigation—as such, absent a class action, few individuals could afford to bring an individual lawsuit over the amounts or conduct at issue. *See Gordon*, 224 Ill. App. 3d at 204.

Accordingly, the first prerequisite for class certification is met.[3]

**B.      Commonality and Predominance: The Proposed Class Shares Common Questions of Law and Fact that Predominate Over Any Individual Issues.**

Section 2-801's second prerequisite requires that there are "questions of fact or law common to the class" and those questions "predominate over any questions affecting only individual members." 735 ILCS 5/2-801(2). Common questions of law or fact are typically found to exist when the members of a proposed class have been aggrieved by the same or similar misconduct. *See Miner v. Gillette Co.*, 87 Ill. 2d 7, 17 (1981); *Steinberg*, 69 Ill. 2d at 341; *McCarthy v. LaSalle Nat'l Bank & Trust Co.*, 230 Ill. App. 3d 628, 634 (Ill. Ct. App. 1992).

---

[3]      To the extent the Court requires additional details regarding the number of members in the Class, such information may be readily obtained through discovery.

After common questions of law or fact have been identified, these common questions must also predominate over any issues affecting only individual class members. *See O-Kay Shoes, Inc. v. Rosewell*, 129 Ill. App. 3d 405, 408 (Ill. Ct. App. 1984). Ultimately, commonality is a relatively low and easily surmountable hurdle. *See Scholes v. Stone, McGuire, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (*citing* Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–132 (2009)).

In this case, all members of the proposed Class share claims that arose out of the same activity of Facebook, that are based on the same legal theory, and that implicate the following common questions or issues of fact that predominate over issues affecting only individual members. Those common factual and legal issues for the Class include, but are not necessarily limited to: (i) whether Facebook collected or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information; (ii) whether Facebook properly informed Plaintiff and the Class that it collected, used, and stored their biometric identifiers or biometric information; (iii) whether Facebook obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometrics identifiers or biometric information; (iv) whether Facebook has sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometrics identifiers or biometric information; (v) whether Facebook developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometrics information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied, or within 3 years of

their last interaction, whichever occurs first; (vi) whether Facebook used Plaintiff's and the Class's biometric identifiers or biometric information to identify them; and (vii) whether Facebook's violations of the BIPA were committed intentionally, recklessly, or negligently. (Compl. ¶ 42.)

Accordingly, Section 2-801's commonality and predominance requirements are met and any supposedly missing information can be secured through discovery.

### C. Adequacy of Representation: Plaintiff and His Counsel are Adequate Representatives and Have No Conflicts with the Members of the Class.

The third prerequisite of Section 2-801 requires that "[t]he representative parties will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3). The purpose of the adequacy of representation requirement is "to insure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Purcell and Wardrope Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1078 (Ill. Ct. App. 1988); *Gordon*, 224 Ill. App. 3d at 203.

In this case, Plaintiff has the same interests as the proposed Class—they all had their biometric identifiers or biometric information collected, stored, and used by Facebook in a virtually identical manner, without their knowledge, authorization, or informed written consent. (Compl. ¶¶ 4, 5, 25, 38, 42.) Plaintiff has no interests antagonistic to those of the Class, and therefore will fairly and adequately protect the interests of the Class. (*Id.* ¶ 42.) Plaintiff's pursuit of the instant action demonstrates as much.

Moreover, Plaintiff's counsel are well-respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class actions involving issues of similar size, scope, and complexity as the present case. (*Id.*); *see also* Firm Resume of Edelson PC, a true and accurate copy of which is attached as Exhibit 1;

*Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987) (proposed class counsel

must be competent and have the resources necessary to sustain the complex litigation; it is

persuasive evidence that proposed class counsel have been found adequate in past cases).

Thus, the adequacy of representation requirement is satisfied as well.

### D. Appropriateness: This Class Action is the Most Appropriate Method to Adjudicate the Claims at Issue.

The final prerequisite to class certification is met where "[t]he class action is an

appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-

801(4). "In applying this prerequisite in a particular case, a court considers whether a class

action: (1) can best secure the economies of time, effort and expense, and promote uniformity; or

(2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*,

224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801

are established makes it evident that the fourth requirement is fulfilled." *Id.* at 204; *Purcell and*

*Wardrope Chtd.*, 175 Ill. App. 3d at 1079 ("[T]he predominance of common issues [may] make a

class action . . . a fair and efficient method to resolve the dispute."). Additionally, a "controlling

factor in many cases is that the class action is the only practical means for class members to

receive redress." *Gordon*, 224 Ill. App. 3d at 203; *Eshaghi v. Hanley Dawson Cadillac Co., Inc.*,

214 Ill. App. 3d 995, 1004 (Ill. App. Ct. 1991) ("In a large and impersonal society, class actions

are often the last barricade of consumer protection.").

Under the circumstances of this case, a class action is the most appropriate method for the

fair and efficient adjudication of the claims of Plaintiff and the proposed Class. The injuries

suffered by individual members of the Class are likely to have been relatively small compared to

the burden and expense of individual prosecution of the litigation necessitated by Facebook's

conduct. (Compl. ¶ 43.) Thus, absent a class action, it would be difficult, if not impossible, for

the individual members of the Class to obtain effective relief. (*Id.*) Maintenance of this case as a class action is also appropriate because it would avoid the necessity for multiple adjudications of identical legal and factual issues, thereby reducing the burden on the parties and the judiciary. Likewise, the fact that Section 2-801's numerosity, commonality and predominance, and adequacy of representation requirements have been satisfied, further demonstrates the appropriateness of proceeding with this case as a class action.

Accordingly, Section 2-801's final prerequisite is satisfied and the proposed Class warrants certification.

## IV.    CONCLUSION.

For the reasons stated above, and which will be borne out by class discovery, this case is appropriate for class certification. Plaintiff Carlo Licata, individually and on behalf of the proposed Class, respectfully requests that the Court: (1) enter and reserve ruling on his motion for class certification; (2) allow for discovery to take place; (3) grant Plaintiff leave to file an amended motion upon the conclusion of discovery relating to certification issues; (4) grant Plaintiff's motion for class certification after full briefing; and (5) provide all other and further relief that the Court deems equitable and just.[4]

//

//

//

---

[4]    Plaintiff respectfully reserves the right to amend the definitions of the proposed Class and provide other factual support as appropriate after certification-related discovery.

Respectfully submitted,

**CARLO LICATA**, individually and on behalf
of all others similarly situated,

Dated: April 1, 2015

By: _____
      One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
J. Dominick Larry
nlarry@edelson.com
David I. Mindell
dmindell@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

# **<u>EXHIBIT 1</u>**

# EDELSON PC FIRM RESUME

EDELSON PC is a plaintiffs' class action and commercial litigation firm with attorneys in Illinois and California.

Our attorneys have been recognized as leaders in these fields by state and federal legislatures, national and international media groups, the courts, and our peers. Our reputation for leadership in class action litigation has led state and federal courts to appoint us lead counsel in many high-profile class actions, including privacy suits against comScore, Netflix, Time, Microsoft, and Facebook; numerous Telephone Consumer Protection Act ("TCPA") cases against companies such as Google, Twentieth Century Fox, and Simon & Schuster; class actions against Citibank, Wells Fargo, and JP Morgan Chase related to reductions in home equity lines of credit; fraudulent marketing cases against software companies such as Symantec; mobile content class actions against all major cellular telephone carriers; the Thomas the Tank Engine lead paint class actions; and the tainted pet food litigation. We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy, and other issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools, and are asked to serve as testifying experts in cases involving class action and consumer issues.

## PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON PC is a leader in plaintiffs' class and mass action litigation, with a particular emphasis on consumer technology class actions, and has been called a "class action 'super firm.'" (Decalogue Society of Lawyers, Spring 2010.) As recognized by federal courts nationwide, our firm has an "extensive histor[y] of experience in complex class action litigation, and [is a] well-respected law firm[] in the plaintiffs' class action bar." *In re Pet Food Prod. Liab. Litig.*, MDL Dkt. No. 1850, No. 07-2867 (NLH) (D.N.J. Nov. 18, 2008). A leading arbitrator concurred, finding that Edelson was "extraordinarily experienced" in "consumer protection class actions generally," including "technology consumer protection class action[s]."

In appointing our firm interim co-lead in one of the most high profile cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." *In Re JPMorgan Chase Home Equity Line of Credit Litig.*, No. 10 C 3647 (N.D. Ill. July 16, 2010). After hard fought litigation, that case settled, resulting in the reinstatement of between $3.2 billion and $4.7 billion in home credit lines.

We have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. C 10-02389, Dkt. 69 at 5 (N.D. Cal. Dec. 10, 2010) (order appointing the firm interim co-lead of privacy class action); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379, Dkt. 59 at 5 (N.D. Cal. Aug. 12, 2011) (appointing us the sole lead counsel due, in part, to our "significant and particularly specialized expertise in electronic privacy litigation and class actions[.]").

Similarly, as recognized by a recent federal court, our firm has "pioneered the application of the TCPA to text-messaging technology, litigating some of the largest consumer class actions in the country on this issue." *Ellison v Steve Madden, Ltd.*, No. 11-cv-5935 PSG, Dkt. 73 at 9 (C.D. Cal. May 7, 2013).

We have several sub-specialties within our plaintiffs' class action practice:

## PRIVACY/DATA LOSS

### *Data Loss/Unauthorized Disclosure of Data*

We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Redbox, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft, and others involving failures to protect customers' private information, security breaches, and unauthorized sharing of personal information with third parties. Representative settlements and ongoing cases include:

- *Dunstan v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.): Lead counsel in certified class action accusing Internet analytics company of improper data collection practices. The court has finally approved a $14 million settlement.

- *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.): Lead counsel in data breach case filed against health insurance company. Obtained landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred. Case also resulted in the first class action settlement in the country to provide data breach victims with monetary payments irrespective of identity theft.

- *In re Netflix Privacy Litigation*, No. 11-cv-00379 (N.D. Cal.): Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act by illegally retaining customer viewing information. Case resulted in a $9 million dollar *cy pres* settlement that has been finally approved (pending appeal).

- *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Grenke v. Hearst Communications, Inc.*, No. 12-cv-14221 (E.D. Mich.); *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich.): Consolidated actions brought under Michigan's Video Rental Privacy Act, alleging unlawful disclosure of subscribers' personal information. In a ground-breaking decision, the court denied three motions to dismiss finding that the magazine publishers were covered by the act and that the illegal sale of personal information triggers an automatic $5,000 award to each aggrieved consumer.

- *Standiford v. Palm*, No. 09-cv-05719-LHK (N.D. Cal.): Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litig.*, No. 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *In re Facebook Privacy Litigation*, No. 10-cv-02389 (N.D. Cal.): Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *In re Sidekick Litigation*, No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Desantis v. Sears*, No. 08 CH 00448 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the Internet.

### Telephone Consumer Protection Act

Edelson has been at the forefront of TCPA litigation for over six years, having secured the groundbreaking *Satterfield* ruling in the Ninth Circuit applying the TCPA to text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009). In addition to numerous settlements totaling over $100 million in relief to consumers, we have over two dozen putative TCPA class actions pending against companies including Santander Consumer USA, Inc., Walgreen Co., Path, Inc., Nuance Communications, Inc., Stonebridge Life Insurance, Inc., GEICO, DirectBuy, Inc., and RCI, Inc. Representative settlements and ongoing cases include:

- *Rojas v CEC*, No. 10-cv-05260 (N.D. Ill.): Lead counsel in text spam class action that settled for $19,999,400.

- *In re Jiffy Lube Int'l Text Spam Litigation*, No. 11-md-2261, 2012 WL 762888 (S.D. Cal.): Co-lead counsel in $35 million text spam settlement.

- *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Kramer v. B2Mobile*, No. 0-cv-02722-CW (N.D. Cal.): Lead counsel in $12.2 million text spam settlement.

- *Pimental v. Google, Inc.*, No. 11-cv-02585 (N.D. Cal.): Lead counsel in class action alleging that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provides class members with an unprecedented $500 recovery.

- *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Miller v. Red Bull*, No. 12-CV-04961 (N.D. Ill.): Lead counsel in $6 million text spam settlement.

- *Woodman v. ADP Dealer Services*, No. 2013 CH 10169 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $7.5 million text spam settlement.

- *Lockett v. Mogreet, Inc.*, No 2013 CH 21352 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $16 million text spam settlement.

- *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $16 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): Co-lead counsel in in $10 million text spam settlement.

- *Weinstein v. Airit2me, Inc.*, No. 06 C 0484 (N.D. Ill): Co-lead counsel in $7 million text spam settlement.

## CONSUMER TECHNOLOGY

### *Fraudulent Software*

In addition to the settlements listed below, EDELSON PC has consumer fraud cases pending in courts nationwide against companies such as McAfee, Inc., Avanquest North America Inc., PC Cleaner, AVG, iolo Technologies, LLC, among others. Representative settlements include:

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

- *Gross v. Symantec Corp.*, No. 12-cv-00154-CRB (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $11 million.

- *LaGarde v. Support.com, Inc.*, No. 12-cv-00609-JSC (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $8.59 million.

- *Ledet v. Ascentive LLC*, No. 11-CV-294-PBT (E.D. Pa.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.6 million.

- *Webb v. Cleverbridge, Inc.*, No. 1:11-cv-04141 (N.D. Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $5.5 million.

***Video Games***

EDELSON PC has litigated cases video-game related cases against Activision Blizzard Inc., Electronic Arts, Inc., Google, and Zenimax Media, Inc., and has active litigation pending, including:

- *Locke v. Sega of America*, No. 13-cv-01962-MEJ (N.D. Cal.): Pending putative class action alleging that Sega of America and Gearbox Software released video game trailer that falsely represented the actual content of the game.

## MORTGAGE & BANKING

EDELSON PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Our suits include claims that certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. We achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "[p]rompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring). Our settlements have restored billions of dollars in home credit lines to people throughout the country. Representative cases and settlements include:

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, No. 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Settlement restored between $3.2 billion and $4.7 billion in credit to the class.

- *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152-CW (N.D. Cal.): Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over

$1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litig.*, No. 09-cv-0350-MMC (N.D. Cal.): Lead counsel in class actions challenging Citibank's suspensions of home equity lines of credit. The settlement restored up to $653,920,000 worth of credit to affected borrowers.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.): In ongoing putative class action, obtained first appellate decision in the country recognizing the right of private litigants to sue to enforce HAMP trial plans.

## GENERAL CONSUMER PROTECTION CLASS ACTIONS

We have successfully prosecuted countless class actions against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers. In addition to the settlements listed below, EDELSON PC have litigated consumer fraud cases in courts nationwide against companies such as Motorola Mobility, Stonebridge Benefit Services, J.C. Penney, Sempris LLC, and Plimus, LLC. Representative settlements include:

### Mobile Content

We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton Cnty. Super. Ct., Ga.): Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation. "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges. Case settled for $36 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Case settled for $12 million.

- *Parone v. m-Qube, Inc.*, No. 08 CH 15834 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving over 2 dozen cases alleging

the imposition of unauthorized mobile content charges. Case settled for $12.254 million.

- *Williams v. Motricity, Inc.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.): Lead counsel in class action settlement alleging unauthorized mobile content charges. Case settled for $7.6 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (L.A. Super. Ct., Cal.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Settlement provided class members with full refunds.

- *Abrams v. Facebook, Inc.*, No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

### Deceptive Marketing

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D. Ill.): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 10-cv-02964 (N.D. Ill.): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No. 11-cv-01785 (N.D. Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763 (N.D. Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between

$11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill.): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill.): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

- *Zurakov v. Register.com*, No. 01-600703 (N.Y. Sup. Ct., N.Y. Cnty.): Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its allegedly deceptive practices in advertising on "coming soon" pages of newly registered Internet domain names. Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

## PRODUCTS LIABILITY CLASS ACTIONS

We have been appointed lead counsel in state and federal products liability class settlements, including a $30 million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada. Representative settlements include:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D.N.J.): Part of mediation team in class action involving largest pet food recall in United

States history. Settlement provided $24 million common fund and $8 million in charge backs.

## INSURANCE CLASS ACTIONS

We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds. Representative settlements include:

- *Holloway v. J.C. Penney*, No. 97 C 4555 (N.D. Ill.): One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

## MASS/CLASS TORT CASES

Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second-hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions. Representative settlements include:

- *Aaron v. Chicago Housing Authority*, No. 99 L 11738 (Cir. Ct. Cook Cnty., Ill.): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and

radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes, to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner of EDELSON PC. He has been recognized as a leader in class actions, technology law, corporate compliance issues, and consumer advocacy by his peers, the media, state and federal legislators, academia, and courts throughout the country.

Jay has been appointed lead counsel in numerous state, federal, and international class actions, resulting in hundreds of millions of dollars for his clients. He is regularly asked to weigh in on federal and state legislation involving his cases. He testified to the U.S. Senate about the largest pet food recall in the country's history and is advising state and federal politicians on consumer issues relating to the recent federal bailouts, as well as technology issues, such as those involving mobile marketing. Jay also counsels companies on legal compliance and legislative issues in addition to handling all types of complex commercial litigation.

Jay has litigated class actions that have established precedent concerning the ownership rights of domain name registrants, the applicability of consumer protection statutes to Internet businesses, and the interpretation of numerous other state and federal statutes including the Telephone Consumer Protection Act and the Video Privacy Protection Act. As lead counsel, he has also secured settlement in cases of first impression involving Facebook, Microsoft, AT&T, and countless others, collectively worth hundreds of millions of dollars.

In addition to technology based litigation, Jay has been involved in a number of high-profile "mass tort" class actions and product recall cases, including cases against Menu Foods for selling contaminated pet food, a $30 million class action settlement involving the Thomas the Tank Engine toy train recall, and suits involving damages arising from second-hand smoke.

In 2009, Jay was named one of the top 40 Illinois attorneys under 40 by the Chicago Daily Law Bulletin. In giving Jay that award, he was heralded for his history of bringing and winning landmark cases and for his "reputation for integrity" in the "rough and tumble class action arena." In the same award, he was called "one of the best in the country" when it "comes to legal strategy and execution." Also in 2009, Jay was included in the American Bar Association's "24 hours of Legal Rebels" program, where he was dubbed one of "the most creative minds in the legal profession" for his views of associate training and firm management. In 2010, he was presented with the Annual Humanitarian Award in recognition of his "personal integrity,

professional achievements, and charitable contributions" by the Hope Presbyterian Church. Starting in 2011, he has been selected as an Illinois Super Lawyer and, separately, as a top Illinois class action lawyer by Benchmark Plaintiff.

Jay is frequently asked to participate in legal seminars and discussions regarding the cases he is prosecuting, including serving as panelist on national symposium on tort reform and, separately, serving as a panelist on litigating high-profile cases. He has also appeared on dozens of television and radio programs to discuss his cases. He has taught classes on class action law at Northwestern Law School and The John Marshall Law School, and has co-chaired a 2-day national symposium on class action issues. He has been an adjunct professor, teaching a seminar on class action litigation at the Chicago-Kent College of Law since 2010.

Jay is a graduate of Brandeis University and the University of Michigan Law School.

**RYAN D. ANDREWS** is a Partner at Edelson PC. He presently leads the firm's complex case resolution and appellate practice group, which oversees the firm's class settlements, class notice programs, and briefing on issues of first impression.

Ryan has been appointed class counsel in numerous federal and state class actions nationwide that have resulted in over $100 million dollars in refunds to consumers, including: *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.); *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.); *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.); and *Lofton v. Bank of America Corp.*, No. 07-5892 (N.D. Cal.).

Representative reported decisions include: *Lozano v. Twentieth Century Fox*, 702 F. Supp. 2d 999 (N.D. Ill. 2010), *Satterfield v. Simon & Schuster, Inc.* 569 F.3d 946 (9th Cir. 2009), *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); *In re Jiffy Lube Int'l Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013); and *Kristensen v. Credit Payment Servs.*, No. 2:12-CV-00528-APG, --- F. Supp. 2d ---, 2014 WL 1256035 (D. Nev. Mar. 26, 2014).

Ryan graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications. Ryan received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Ryan has served as an Adjunct Professor of Law at Chicago-Kent, teaching a third-year seminar on class actions. While in law school, Ryan was a Notes & Comments Editor for The Chicago-Kent Law Review, earned CALI awards for the highest grade in five classes, and was a teaching assistant for both Property Law and Legal Writing courses. Ryan externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois.

Ryan is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner and the Chair of the Corporate Governance and Business Litigation Practice Group. Rafey's practice focuses upon a wide range of complex consumer class action litigation, as well as general business litigation.

On the plaintiff's side, Rafey has been appointed lead counsel in numerous class actions, including landmark settlements involving the telecom industry worth hundreds of millions of dollars. Rafey has been appointed Class Counsel in nationwide class action settlements against the major wireless carriers, aggregators, and providers of "mobile content," including *Van Dyke v. Media Breakaway, LLC*, No. 08-cv-22131 (S.D. Fla.); *Parone v. m-Qube, Inc.*, No. 08 CH 15834 (Cir. Ct. Cook County, Ill.); *Williams v. Motricity, Inc., et al.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.); and *Walker v. OpenMarket, Inc., et al.*, No. 08 CH 40592 (Cir. Ct. Cook Cnty., Ill.).

On the business side, Rafey has counseled clients ranging from "emerging technology" companies, real estate developers, hotels, insurance companies, lenders, shareholders and attorneys. He has successful litigated numerous multi-million dollar cases, including several "bet the company" cases.

Rafey has first chaired jury and bench trials, mediations, and national and international arbitrations.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, he received a certificate in international and comparative law. Rafey received his B.A. in History, with distinction, from the University of Colorado – Boulder in 2002.

**CHRISTOPHER L. DORE** is a Partner at Edelson and a member of the Technology and Fraudulent Marketing Group. Chris focuses his practice on emerging consumer technology issues, with his cases relating to online fraud, deceptive marketing, consumer privacy, negative option membership enrollment, and unsolicited text messaging. Chris is also a member of the firm's Incubation and Startup Development Group wherein he consults with emergent businesses.

Chris has been appointed class counsel in multiple class actions, including one of the largest text-spam settlements under the Telephone Consumer Protection Act, ground breaking issues in the mobile phone industry and fraudulent marketing, as well as consumer privacy. *See Pimental v. Google, Inc.*, No. 11-cv-02585 (N.D. Cal.); *Turner v. Storm8, LLC*, No. 09-cv-05234 (N.D. Cal.); *Standiford v Palm, Inc.*, No. 09-cv-05719-LHK (N.D. Cal.); and *Espinal v. Burger King Corp.*, No. 09-cv-20982 (S.D. Fla.). In addition, Chris has achieved groundbreaking court decisions protecting consumer rights. Representative reported decisions include: *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855 (N.D. Cal. 2011); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); and *Van Tassell v. United Marketing Group, LLC*, 795 F. Supp. 2d 770 (N.D. Ill. 2011). In total, his suits have resulted in hundreds of millions of dollars to consumers.

Prior to joining Edelson, Chris worked for two large defense firms in the areas of employment and products liability. Chris graduated *magna cum laude* from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member

for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation and negations.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating *magna cum laude* from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**BENJAMIN H. RICHMAN** is a Partner at EDELSON PC and is a member of the firm's Corporate Governance and Business Litigation Practice Group. He handles plaintiffs'-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is also the director of EDELSON PC's Summer Associate Program.

**ARI J. SCHARG** is a Partner at EDELSON PC. He handles technology-related class actions, focusing mainly on cases involving the unlawful geo-locational tracking of consumers through their mobile devices, the illegal collection, storage, and disclosure of personal information, fraudulent software products, data breaches, and text message spam. His settlements have resulted in tens of millions of dollars to consumers, as well as industry-changing injunctive relief. Ari has been appointed class counsel by state and federal courts in several nationwide class action settlements, including *Webb v. Cleverbridge*, No. 11-cv-4141 (N.D. Ill.); *Ledet v. Ascentive*, No. 11-cv-294 (E.D. Penn.); and *Drymon v. CyberDefender*, No. 11 CH 16779 (Cir. Ct. Cook Cnty., Ill.); and was appointed sole-lead class counsel in *Loewy v. Live Nation*, No. 11-cv-4872 (N.D. Ill.), where the court praised his work as "impressive" and noted that he

"understand[s] what it means to be on a team that's working toward justice." Ari was selected as an Illinois Rising Star (2013) by Super Lawyers.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.

Ari is very active in community groups and legal industry associations. He is a member of the Board of Directors of the Chicago Legal Clinic, an organization that provides legal services to low-income families in the Chicago area. Ari acts as Outreach Chair of the Young Adult Division of American Committee for the Shaare Zedek Medical Center in Jerusalem, and is actively involved with the Anti-Defamation League. He is also a member of the Standard Club Associates Committee.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for The John Marshall Law Review and competed nationally in trial competitions. During law school, he also served as a judicial extern to The Honorable Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**COURTNEY BOOTH** is an Associate at EDELSON PC. Courtney focuses her practice on consumer class actions.

Courtney received her J.D., *magna cum laude*, from The John Marshall Law School. While in law school, she was a staff editor of The John Marshall Law Review, a teaching assistant for Legal Writing and Civil Procedure, and a member of the Moot Court Honor Society. Courtney represented John Marshall at the Mercer Legal Ethics and Professionalism Competition where she was a semi-finalist and won Best Respondent's Brief and at the Cardozo/BMI Entertainment and Communications Law Competition where she placed in the top three oralists. Courtney was recently nominated as a 2013 Member of the National Order of Scribes.

Prior to law school, Courtney attended Saint Louis University where she earned a B.A. in Communication. While there, she was a community relations intern for the St. Louis Blues.

**ALICIA HWANG** is an Associate at EDELSON PC. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law in May 2012, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON PC, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated *magna cum laude* from the University of Southern California, earning her B.A. in Communication in 2007. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON PC. Nick practices in the area of consumer class action and general litigation.

Nick received his J.D., *cum laude*, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law in 2008 and played on the school's rugby team.

**DAVID I. MINDELL** is an Associate at EDELSON PC. David practices in the area of technology and privacy class actions.

David helps direct a team of attorneys and engineers in investigating and litigating cases involving complex tech fraud and privacy violations. His team's research has led to lawsuits involving the fraudulent development, marketing and sale of computer software, unlawful tracking of consumers through mobile-devices and computers, unlawful collection, storage, and dissemination of consumer data, mobile-device privacy violations, large-scale data breaches, and the Bitcoin industry. On the other side, David also serves as a consultant to a variety of emerging technology companies.

Prior to joining EDELSON PC, David co-founded several technology companies that reached multi-million dollar valuations within 12 months of launch. David has advised or created strategic development and exit plans for a variety of other technology companies.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the preeminent cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has given speeches related to his research to a wide-range of audiences.

**AMIR MISSAGHI** is an Associate at Edelson, where he focuses on technology and privacy class actions.

Amir received his J.D. from the Chicago-Kent College of Law, where he was a member of the Moot Court Honor Society and a teaching assistant in Property. Before law school, he attended the University of Minnesota, where he received his B.S. and M.S. in Applied Economics. He then began working at a Fortune 50 company as a programmer and data analyst. During that time

Amir started working on his graduate studies in Applied Economics where he focused on analyzing consumer choice in healthcare markets.

**JOHN OCHOA** is an associate at EDELSON PC, focusing his practice on protecting consumers with a special emphasis on plaintiffs' privacy class action litigation, including cases brought under the Telephone Consumer Protection Act. John prosecutes cases in both state and federal courts at the trial and appellate levels.

John has secured important court decisions protecting the rights of consumers, including *Elder v. Pacific Bell Telephone Co*, 205 Cal. App. 4th 841 (2012), where the California Court of Appeal held that consumers may pursue claims against telecommunications companies for placing unauthorized charges on consumers' telephone bills, a practice known as "cramming." John was also appointed class counsel in *Lee v. Stonebridge Life Insurance Co*, 289 F.R.D. 292 (N.D. Cal. 2013), a case where the defendants are alleged to have caused the transmission of unauthorized text messages to the cellular telephones of thousands of consumers.

He graduated *magna cum laude* from The John Marshall Law School in May 2010 and served as Managing Editor for The John Marshall Law Review. His student Comment, which examines bicycling and government tort immunity in Illinois, appears in Vol. 43, No. 1 of The John Marshall Law Review. While in law school, John externed with Judge Thomas Hoffman at the Illinois Appellate Court, and competed in the ABA National Appellate Advocacy Competition.

John is active in the Illinois legal community, and serves as Co-Chair of the Membership Committee on the Young Professionals Board of Illinois Legal Aid Online (ILAO). ILAO is a non-profit organization committed to using technology to increase access to free and pro bono legal services for underserved communities throughout Illinois.

He received his B.A. with Honors in Political Science from the University of Iowa in 2004.

**ROGER PERLSTADT** is an Associate at EDELSON PC, where he concentrates on appellate and complex litigation advocacy. Roger graduated from the University of Chicago Law School, where he was a member of the University of Chicago Law Review. After law school, he served as a clerk to the Honorable Elaine E. Bucklo of the United States District Court for the Northern District of Illinois.

Prior to joining the firm, Roger spent several years at a litigation boutique in Chicago where his practice included employment and housing discrimination claims, constitutional litigation, and general commercial matters. In 2011, he was named a Rising Star by Illinois Super Lawyers Magazine.

Roger also spent time as a Visiting Assistant Professor at the University of Florida Law School where he taught Arbitration, Conflict of Laws, and Employment Discrimination, and has published articles on the Federal Arbitration Act in various law reviews.

**EVE-LYNN J. RAPP** is an Associate at EDELSON PC. Eve-Lynn focuses her practice in the areas of consumer and technology class action litigation.

Prior to joining EDELSON PC, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses and public interest litigation. Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating cum laude, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also clerked for both civil and criminal judges (Honorable Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BEN THOMASSEN** is an Associate at EDELSON PC. At the firm, Ben's practice centers on the prosecution of class actions cases that address federally protected privacy rights and issues of consumer fraud—several of which have established industry-changing precedent. Among other high profile cases, Ben recently played key roles in delivering the winning oral argument before the United States Court of Appeals for the Eleventh Circuit in *Curry v. AvMed*, 693 F.3d 1317 (11th Cir. 2012) (a data breach case that has, following the Eleventh Circuit's decision, garnered national attention both within and without the legal profession) and securing certification of a massive consumer class in *Dunstan v. comScore*, No. 11 C 5807, 2013 WL 1339262 (N.D. Ill. Apr. 2, 2013) (estimated by several sources as the largest privacy case ever certified on an adversarial basis).

Ben received his J.D., *magna cum laude*, from the Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif. At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and earned (a currently unbroken firm record of) seven CALI awards for receiving the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before settling into his legal career, Ben worked in and around the Chicago and Washington, D.C. areas in a number of capacities, including stints as a website designer/developer, a regular contributor to a monthly Capitol Hill newspaper, and a film projectionist and media technician (with many years experience) for commercial theatres, museums, and educational institutions. Ben received his Bachelor of Arts, *summa cum laude*, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.